# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,

        Movant

    v.

PIO SAGAPOLUTELE, *et al.*,

        Respondents.

\*        

Case No. 1:08-mc-00653-RMU
(pending in the District of Maryland as
Case No. 08-01870 WMN)

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF RESPONDENTS'
## (1) OPPOSITION TO NATIONAL FOOTBALL LEAGUE
## PLAYERS ASSOCIATION MOTION TO QUASH AND
## (2) MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Respondents, Pio Sagapolutele, Sean Lamar Smith, and Bruce Schwager, plaintiffs in *Sagapolutele et al. v. The Bert Bell/Pete Rozelle NFL Players Retirement Plans et al.*, Case No. 08-cv-1870-WMN (D. Md.), submit this combined Memorandum in support of their (1) Opposition to the Motion to Quash filed by Movant National Football League Players Association ("NFLPA"); and (2) Motion to Compel Production of Documents by NFLPA. As set forth below, this Court should deny the NFLPA's Motion to Quash and grant Respondents' Motion to Compel.

## INTRODUCTION

Respondents are three retired NFL football players who are plaintiffs in an action

2003561.1

brought in the United States District Court for the District of Maryland and pending before the Hon. William M. Nickerson (the "Underlying Action"). The defendants are two employee benefit plans (collectively, the "Plans") under the Employee Retirement Income and Security Act, 29 U.S.C. §§ 1001, et seq. ("ERISA"), and Respondents are challenging the Plans' denial of Respondents' claims for full disability retirement benefits.

The Plans are administered by six trustees, three appointed by the NFLPA, which represents active NFL players, and three appointed by the NFL Management Council ("NFLMC"), which represents NFL owners. The NFLPA maintains its headquarters in this District, while the NFLMC's offices are in New York City. The Complaint in the Underlying Action (Ex. A hereto) alleges that Defendants' benefit decisions were wrongful, willful, and the result of bias and animus of the Plans and the NFLPA against retired NFL players. Complaint ¶¶ 3, 18-25, 54, 59, 64.

Case law establishes that the standard of review in federal court for benefit determinations, as well as the reasonableness of those decisions, is determined in part by whether there is any conflict of interest on the part of the Plans or whether the Plans have any demonstrated bias or animus toward their beneficiaries. To explore these issues, Respondents in the Underlying Action served (1) written discovery on the Plans and (2) deposition subpoenas upon the NFLMC (in the Southern District of New York)

2003561.1

and the NFLPA (in this District).[1]  The Plans moved for a protective order in the Underlying Action to block that discovery, arguing that discovery is limited to the administrative record.  That motion for protective order was fully briefed by the parties as of October 10, 2008 and is still pending.  Respondents, the Plans, and the NFLMC have agreed to postpone discovery and the NFLMC deposition until the court in the Underlying Action rules on that motion.  *See* Ex. C (Stipulation) and Ex. D (letter to Judge Nickerson).

The NFLPA has taken a different course.  After originally filing a similar motion for protective order in the Underlying Action on September 12, 2008, the NFLPA subsequently withdrew that motion and (a) submitted written objections to the document production provisions of the deposition subpoena, pursuant to Rule 45(c)(2)(B); and (b) filed a Motion to Quash the subpoena in this miscellaneous action.  Attempts by Respondents and the NFLPA to negotiate a postponement of the NFLPA deposition pending a ruling on the Plans' motion for protective order in the Underlying Action were unsuccessful.  *See* Ex. C, D, and E to the NFLPA's Motion to Quash.  Accordingly, pursuant to Rule 45(c)(2)(B)(i), Respondents have moved to compel production of the subpoenaed documents to which the NFLPA served written objections.  Separately, Respondents also oppose the NFLPA's Motion to Quash.

---

[1] A copy of the deposition subpoena duces tecum served on the NFLPA is attached hereto as Ex. B.

Like the motion for protective order it originally filed, the NFLPA's Motion to Quash asserts that the documents and testimony sought by the subpoena are irrelevant to the Underlying Action on the theory that discovery should be limited to the administrative record.  In addition, the Motion to Quash argues – without any factual support – that the requested documents are privileged, and that production of the requested documents would create an "undue burden" for the NFLPA.

This Court should deny the NFLPA's Motions to Quash, and grant Respondent's Motion to Compel Production of Documents, for three reasons.  **First**, the NFLPA has not met the "heavy burden" the Federal Rules and case law impose for the extraordinary relief of quashing the subpoena.   The NFLPA's relevance argument is wrong as a matter of law, and its privilege and undue burden arguments are bald assertions that lack any factual or documentary support.  When, as here, the Underlying Action is pending in another court, a court faced with a motion to quash should "be cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery."  *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 103 (D.D.C. 2005).

**Second**, as a matter of law, the NFLPA is incorrect that discovery in actions such as the Underlying Action is limited to the administrative record.  Although review of the merits of a pension benefits decision is limited to the administrative record (*e.g.*, medical records), courts – including the District of Maryland – regularly permit discovery about conflict of interest, bias, and animus to determine the applicable standard of review.  Far

from being foreclosed, such discovery is actually the starting point for judicial review of a benefit determination.

**Third**, Respondents' requests to depose the NFLPA do not come in a vacuum, but in the wake of a well-documented history by the Plans and the NFLPA of open hostility, bias, and unprincipled benefits determinations against retired players like Respondents. Indeed, the District of Maryland has admonished the Plans for their "culpable, if not bad faith" benefit determination in a similar case, and published remarks by the NFLPA's former executive director (who ran the organization at all times relevant to this action) leave no doubt as to that organization's bias against retired players in these matters. There are also serious questions concerning the funding and administration of the Plans that create a likely conflict of interest by the NFLPA in how it serves its members (*i.e.*, active players) while also serving as a fiduciary for beneficiaries under the Plans (*i.e.*, retired players). Respondents' deposition notice to the NFLPA is tailored to explore these issues which bear directly on conflict of interest, bias, and animus.

Alternatively, this Court should defer a ruling on the NFLPA's Motion to Quash and Respondents' Motion to Compel until after (1) the Maryland court in the Underlying Action has ruled on the motion for protective order filed by the Plans; and (2) counsel for Respondents and the NFLPA subsequently meet and confer to attempt to resolve their discovery dispute in light of that ruling.

5

**STATEMENT OF FACTS**

**A.  Plaintiff's Complaint**

The Complaint in the Underlying Action (Ex. A hereto) was brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), which authorizes civil actions by a beneficiary to recover benefits due under the terms of a benefit plan.  The Underlying Action has been assigned in the Maryland court to the Hon. William M. Nickerson for all purposes.

As alleged in the Complaint, Respondents are three former NFL players, each of whom applied for benefits under benefit plans which have been created and funded though the collective bargaining process between the NFLMC and the NFLPA. Complaint ¶ 1.  As for Pio Sagapolutele and Sean Lamar Smith, the Plans awarded a less generous form of benefits than was claimed and also determined that these lower benefits were only payable beginning many years after these players' retirements from professional football.  Complaint ¶¶ 32, 41, 42.  The Plans denied Bruce Schwager's claim outright.  Complaint ¶ 50.  The Complaint alleges that a basis for these benefit decisions was the bias and animus of the Plans and the NFLPA against retired NFL players.  Complaint ¶¶ 3, 18-25, 54, 59, 64.

**B.  The Past History of Bias and Animus Toward Retired Players**

The history of hostility by the Plans and the NFLPA toward retired players and resulting unprincipled benefit determinations is a matter of public record.  The District of Maryland and other courts have found prior denial of benefits to retired NFL players to be "culpable, if not bad faith," *Jani v. The Bert Bell/Pete Rozelle NFL Player Ret. Plan,*

2003561.1

*et al.*, 1:04-cv-01606-WDQ (D. Md. 2005); based on "no relevant medical or employment evidence" as well as "contradict[ed] by the unanimous medical opinion of examining experts," *Jani v. The Bert Bell/Pete Rozelle NFL Player Ret. Plan et al.*, 209 Fed.Appx. 305 (4th Cir. 2006) (collectively, the "*Webster* case"); and an "abuse of discretion," *Meiburger v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 261 Fed.Appx. 522 (4th Cir. 2008). *See* Complaint ¶¶ 18-21, 24.

The problem of unprincipled benefit determinations for retired NFL players has grown so severe that committees of both the U.S. Senate and the U.S. House of Representatives have recently held hearings on the subject. A slew of retired players testified about having disability benefits delayed or denied by the Plans despite overwhelming evidence of disabilities suffered as a result of playing professional football. *See* http://articles.latimes.com/2007/sep/18/sports/sp-nflhearing18 (Senate hearings); http://sports.espn.go.com/nfl/news/story?id=2917473 (House hearings). *See* Complaint ¶ 25. In addition, several advocacy groups comprised of former NFL players have been formed and Web sites launched to lobby and fight for benefits owed to retired players. *E.g.*, "Dignity After Football," (http://www.dignityafterfootball.org); "Fourth and Goal," (http://www.fourthandgoalunites.com); "RetiredPlayers.org" (http://retiredplayers.org).

The numbers tell the dimension of the problem. According to testimony by counsel for the defendant Plans before the House Judiciary Committee last year, out of approximately 7,900 retired NFL players, only 317 players – a meager 4% – were

7

receiving      disability      payments      from      the      Plans.      *See*
http://sports.espn.go.com/nfl/news/story?id=3139465.   The paucity of disability claims

being paid to former players of one of the world's most violent professional sports

suggests a chronic, systemic problem in how these benefit plans are administered.

The response of the NFLPA to this outcry from Congress and retired players has

been, in large part, defiance and promises of more of the same.   In 2006, the NFLPA's

Executive Director, Gene Upshaw,[2] was unapologetic about his disdain for retired NFL

players, telling a newspaper that "The bottom line is I don't work for them. They don't

hire me, and they can't fire me. They can complain about me all day long. They can

have their opinion. But the active players have the vote. That's who pays my salary."

*See*            http://www.usatoday.com/sports/football/nfl/2007-07-08-sw-retirees_N.htm.

Reacting to one retired player's criticism of a pension benefit decision, Upshaw

responded: "A guy like [him] says the things he said about me; you think I'm going to

invite him to dinner? No. I'm going to break his . . . damn neck."   *Id.*   Even after the

Fourth Circuit ruled in the *Webster* case that the Plans had "abused [their] discretion" by

failing to use "a deliberate, principled reasoning process," Mr. Upshaw was unrepentant,

telling the *New York Times* that "if the six-member board was presented with a similar

situation with another retired player, it would follow the same course of action it took

with      Webster."      http://query.nytimes.com/gst/fullpage.html?res=9A0CEFD71531

---

[2] Mr. Upshaw died shortly after the Complaint in the Underlying Action was filed.  He ran
the NFLPA, and was responsible for its role in the Plans, at all times relevant to this
matter.

2003561.1

<u>F937A25751C1A9609C8B63</u>.

In sum, the bias and animus by the NFLPA and the Plans toward retired players is not new. Although this hostility is well documented in prior cases, Congressional hearings, and published reports, it is not part of the administrative record in the Underlying Action, which is why Respondents need discovery from the NFLPA.

### C. <u>Potential Conflict of Interest</u>

One possible motive for the NFLPA's demonstrated bias and hostility toward retired players lies in a structural conflict of interest created by provisions of the Collective Bargaining Agreement between the NFLMC and the NFLPA (the "CBA") which determines the funding of the Plans. Specifically, Article XXIV, §4(c) of the CBA creates an absolute cap for the <u>combined total</u> of "Projected Benefits" (which include funds for disability and retirement benefits) and active player salaries (the "Salary Cap"). This cap is set at 61.68% of projected total league revenue. *See* Ex. E hereto (excerpts from CBA) at p. 20.[3] This combined cap creates a potential conflict of interest on the part of the NFLPA in its dual role as bargaining representative for its members (*i.e.*, the active players) and as fiduciary in appointing the Plans' trustees to determine the claims

---

[3] The CBA is a lengthy, complex document with many interrelated provisions that defy easy understanding. However, the noted deposition of the NFLPA is limited to exploring only those provisions which bear on the facial conflict of interest that arises when one "capped" pool of money is available both for active player salaries and retired player benefits. *See* Ex. B hereto (deposition subpoena to NFLPA listing as a matter for examination the "relationship between and among employer contributions, Projected Benefits, the Salary Cap, Total Revenue, and Guaranteed League-wide Salary," which are all defined terms under the CBA).

2003561.1

of retired players. In other words, at or near this cap, every dollar not spent on disability and retirement benefits to retired players results in more money being available for active players. That the NFLPA would favor active players over retired players in dividing up this common pie is not theoretical, as evidenced by Mr. Upshaw's quoted remarks that "[t]he bottom line is I don't work for [retired players] . . . They don't hire me, and they can't fire me. . . . [T]he active players have the vote. That's who pays my salary." *See* pp. 5-6, *supra*.

Like the NFLPA's history of bias and animus toward retired players, evidence of the potential conflict of interest created by the CBA's funding of the Plans is not part of the administrative record in this case. Accordingly, Respondents need to take the deposition of the NFLPA to explore these issues.

### D. Respondents' Deposition Subpoena to the NFLPA

On September 15, 2008, Respondents served a deposition subpoenas on the NFLPA pursuant to Fed.R.Civ.P. 30(b)(6) (Ex. B hereto).[4] The subpoena directs the NFLPA to produce documents and to designate one or more persons to testify, *inter alia*, on the following subjects:

- the relationship between and among employer contributions, benefits, and the salary cap;

- disability claims assessments and benefit determinations under the Plans

---

[4] An earlier subpoena was served on prior counsel for the NFLPA on September 2, 2008. To correct a procedural error, the subpoena to the NFLPA was re-issued out of this Court and served on the NFLPA at its Washington D.C. headquarters on September 15, 2008.

2003561.1

and their impact on employer contributions, benefits, and the salary cap;

- Actual or potential conflicts of interest and bias by the Plans, the NFLMC, the NFLPA, and related entities in the funding or administration of the Plans, selection of Retirement Board members, and benefit determinations;

- Statements and communications by Mr. Upshaw and other NFLPA representatives concerning retired players and previous benefit cases;

- Proposed and actual changes to the Plans since *Webster*; and

- The NFLPA's actions to combat reform efforts by retired players and Congress.

In response to the subpoena, the NFLPA on September 12, 2008 filed a Motion for Protective Order in the District of Maryland, asserting that the deposition of the NFLPA should not go forward because discovery in the Underlying Action should be restricted to the administrative record of the benefits determination. The NFLPA's motion mirrored a similar motion which had been filed earlier by the Plans. The result of these filings was that all discovery disputes would have been resolved in the District of Maryland, by the judge assigned to the case, Judge Nickerson.

On September 29, 2008, the NFLPA had a change of heart. The union withdrew its motion for protective order in the Underlying Action and served on Respondents' counsel written objections to the document request portion of the subpoena pursuant to Fed.R.Civ.P. 45(c)(2)(B). *See* Ex. B to NFLPA's Motion to Quash. Discussions ensued between counsel for Respondents (plaintiffs in the Underlying Action) and the NFLPA, during which Respondents offered to (a) postpone the deposition until after the

2003561.1

Maryland court in the Underlying Action ruled on the Plans' motion for protective order, (b) meet and confer after said ruling, and thereafter (c) submit any remaining discovery issue to that Maryland court.  *See* Ex. F hereto and Ex. C to NFLPA's Motion to Quash (email strings).

Respondents also addressed the NFLPA's written objections on October 7, 2008, answering some objections, supplying requested definitions, narrowing the scope of some document requests, explaining the relevancy of other requests, and soliciting counsel's participation "in an effort to engage with us in 'good faith efforts' to resolve this discovery dispute."  *See* Ex. D to NFLPA's Motion to Quash.  Counsel for the NFLPA responded that same day, declining to discuss the matter further.  *See* Ex. E to NFLPA's Motion to Quash.  The  Motion to Quash was filed the next day, October 8, 2008.

**ARGUMENT**

## I.  LEGAL STANDARD

### A.  Rule 45(c)

The NFLPA's Motion to Quash is filed pursuant to Rule 45(c)(3), which provides:

> (3) Quashing or Modifying a Subpoena.
>
> (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
>
> (i) fails to allow a reasonable time to comply;
>
> (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from

2003561.1

> where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
>
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
>
> (iv) subjects a person to undue burden.

In its Memorandum in Support of the Motion to Quash ("NFLPA Mem."), the NFLPA does not assert that subsections (i) (reasonable time to comply) or (ii) (geographic limitations) apply. Rather, the NFLPA asks this Court to quash the subpoena on the alleged grounds that (a) the documents and testimony sought are not **relevant** because discovery in the Underlying Action should be confined to the administrative record; (b) the requested documents are **privileged**; and (c) production of the requested documents would create an **undue burden** for the NFLPA. For each of these grounds, the NFLPA bears a heavy burden of showing why the requested documents should not be produced.

### 1. Relevance

The scope of discovery is especially broad and encompasses "any nonprivileged matter that is relevant to any party's claim or defense." Rule 26(b)(1). Moreover, information does not have to be directly relevant to be discoverable, as long as "the discovery appears reasonably calculated to lead to the discovery of admissible

evidence." *Id.* Accordingly, the term "relevance" is broadly construed to grant a party entitled to discovery any information needed to prosecute or defend a specific pending civil action. *See Moore v. Hartman*, 241 F.R.D. 59, 62 (D.D.C. 2007).

A person resisting discovery on the ground of relevance therefore has a heavy burden to overcome:

> For the purposes of discovery, relevancy is broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case. . . . Where information sought appears to be relevant, the party resisting disclosure bears the burden of "demonstrating that the requested discovery either does not come within the broad scope of relevance as defined under Fed.R.Civ.P. 26(b)(1) or is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure."

*Barnett v. PA Consulting Group, Inc.*, 2007 WL 845886 (D.D.C. 2007), at *4 (citations omitted).

### 2. Privilege

A person asserting privilege as a reason for quashing a subpoena must also "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed.R.Civ.P. 45(d)(2)(A)(ii). *See* Fed.R.Civ.P. 26(b)(5)(A)(ii)(same). A person asserting a privilege also bears the burden of "showing that the privilege applies to each communication for which it is asserted." *U.S. v. Legal Services for New York City*, 249 F.3d 1077, 1081-82 (D.C. Cir. 2001). The privilege

2003561.1

must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Sealed Case*, 676 F.2d 793, 807 n. 44 (D.C. Cir.1982).

### 3. <u>Undue Burden</u>

Finally, the "quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances." *Flanagan*, 231 F.R.D. at 102. A party seeking to quash a subpoena under Rule 45(c)(3)(A)(iv) on the basis of undue burden bears the "heavy burden" of establishing such grounds. *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984). *See Flanagan*, 231 F.R.D. at 102 ("the movant's burden is greater for a motion to quash than if she were seeking more limited protection"). This heavy burden can be met only where a movant shows that the request for production of documents is "unreasonable or oppressive," *Northrop Corp*, 751 F.2d at 403. This showing must be made by affidavit or other sworn testimony that "particularly demonstrat[es]" the claimed burden, including (a) the number of people available to conduct the search for responsive records, (b) an estimate of the number of hours required to conduct the requested review, (c) how conducting the review would adversely impact the claimant, (d) and suggested alternatives that reasonably accommodate the requesting party's legitimate discovery needs. *Hopson v. Mayor and City Council of Baltimore*, 232 F.R.D. 228, 245 (D. Md. 2005).

2003561.1

**B. A Court Should Deny a Motion to Quash in Favor of Permissive Discovery Where the Underlying Action is Pending in Another District.**

In cases such as this – where the motion to quash concerns an action pending in another district – the court should resolve any doubts by "err[ing] on the side of permissive discovery." *Flanagan*, 231 F.R.D. at 102. This presumption in favor of permitting the discovery arises from the fact that the court hearing the motion to quash generally has "limited exposure to and understanding of" the underlying action, and should therefore "be cautious in determining relevance of evidence." *Id.* at 103.

**II. THE NFLPA HAS NOT MEET ITS "HEAVY BURDEN" OF DEMONSTRATING GROUNDS FOR QUASHING THE SUBPOENA.**

It is important to note the limited nature of the documents and testimony which Respondents seek from the NFLPA under the deposition subpoena. Respondents do not seek documents or testimony regarding the merits of their disability or retirement claims in the Underlying Action (*i.e.*, additional medical or employment records that are not part of the administrative record). They do not seek documents or testimony about the NFLPA's operations or affairs in a general sense. Rather, the documents and testimony sought are limited to issues concerning conflict of interest, bias, and animus in the way the Plans are funded and administered by the NFLMC and NFLPA.

Despite the limited nature of the subpoena, the NFLPA asks this Court to quash it outright and to forbid all discovery directed at the union. As shown below, however,

2003561.1

the NFLPA has failed to carry its "heavy burden" of establishing any of those three grounds for non-compliance with the subpoena.

### A. **The Limited Documents and Testimony Requested by the Subpoena are Relevant to Issues of Conflict of Interest, Bias, and Animus.**

The threshold question in every ERISA pension benefit case is the standard of review: should it be *de novo*, for abuse of discretion, or somewhere in between? The Supreme Court has long held that conflicts of interest and bias must be considered by a district court in determining the standard of review. In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Court held that where a plan document provides the administrator or fiduciary discretionary authority to determine eligibility for benefits, a denial of benefits is reviewed by a court for abuse of discretion. *Id.* at 111, 115. However, as part of that review, the Court said that a conflict of interest should be weighed as a "factor" in determining whether there was an abuse of that discretion. *Id.* at 115. Just this summer, in *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (June 19, 2008) ("*Glenn*"), the Court confirmed that bias and conflict of interest in the administration of a plan must be taken into account in determining the lawfulness of a benefit denial:

> We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one . . .
>
> . . . The conflict of interest at issue here, for example, should prove more important (perhaps of great importance)

2003561.1

> where circumstances suggest a higher likelihood that it
> affected the benefits decision, including but not limited to,
> <u>cases where [a fiduciary] has a history of biased claims
> administration</u>.

*Id.* at 2351 (emphasis added).

The Underlying Action is pending in the District of Maryland within the Fourth Circuit. In that circuit, evidence of conflict of interest or bias serves two purposes: (a) evaluating the reasonableness of a denial of benefits, and (b) determining the amount of deference to be afforded an administrator's decision on benefits. In *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335 (4th Cir. 2000), the court held that "[t]he fiduciary's motives and any conflict of interest it may have" were one of the factors a district court can use to determine whether the fiduciary abused his discretion in denying benefits to a plan participant. *Id.* at 342-43. The court went on to note that a conflict of interest is also relevant for a second purpose – establishing the appropriate standard of review:

> A fiduciary's conflict of interest, in addition to serving as a
> factor in the reasonableness inquiry, may operate to reduce
> the deference given to a discretionary decision of that
> fiduciary. We have held that a court, presented with a
> fiduciary's conflict of interest, may lessen the deference
> given to the fiduciary's discretionary decision to the extent
> necessary to "neutralize any untoward influence resulting
> from that conflict."

*Booth*, 201 F.3d at 343 n. 2 (citations omitted).

The Fourth Circuit has even held that, in certain cases, a fiduciary's conflict of interest warrants a *de novo* review of a benefits determination. In *Johannssen v. District No. 1 – Pacific Coast District, MEBA Pension Plan*, 292 F.3d 159 (4th Cir. 2002),

two unions had merged and subsequently dissolved after a bitter struggle.  A union-sponsored benefits plan had denied benefits to officers of one of the unions, who then sued under ERISA to recover those benefits.  The court examined evidence outside the administrative record and concluded that a conflict of interest on the part of the plan administrator stemming from the union struggle necessitated a *de novo* standard of review:

> [E]ven apart from the general question of the applicability of the rule in *Firestone* [concerning conflict of interest as a "factor" in evaluating abuse of discretion] to this context, <u>we would still apply *de novo* review in this case due to the plan administrator's palpable conflict of interest</u>.  Though *Firestone* directs abuse of discretion review of plan interpretations made under expressly granted discretionary power, it also cautioned that where a conflict of interest is manifest, such a conflict should be factored into the judicial review process. . . . In this case, [the plan administrator] had a clear conflict of interest because she considered herself to be responsible to the management of [the first union], which has demonstrated through the course of this litigation that it considers this issue as an extension of its bitter campaign against [the second union]. . . . <u>Thus, we would in any event reduce the degree of deference to the extent necessary to neutralize the untoward influence of [the first union] on her decision. . . . Given the source of that decision, our review, once again, is *de novo*</u>.

292 F.3d at 171 (citations omitted) (emphasis added).  *See Guthrie v. National Rural Elec. Cooperative Ass'n Long-Term Disability Plan*, 509 F.3d 644, 649 (4th Cir. 2007)

2003561.1

the greater an administrator's conflict of interest, the less deference a reviewing court will give to the administrator's decision).[5]

The rule that conflict of interest and bias are relevant to determine both the appropriate standard of review and the reasonableness of a benefits decision is followed in other circuits as well. For example, in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006), the Ninth Circuit held that, even where a district court is reviewing a plan administrator's decision for abuse of discretion, the court may consider extrinsic evidence outside the administrative record to "determine whether a conflict of interest exists that would affect the appropriate level of judicial scrutiny. . . [and] to decide the nature, extent, and effect on the decision-making process of any conflict of interest." *Id.* at 970. This inquiry may include evidence of

> malice, of self-dealing, . . . a parsimonious claims-granting history . . [or where the administrator] provides inconsistent reasons for denial, . . . fails adequately to investigate a claim or ask the plaintiff for necessary evidence, . . . fails to credit a claimant's reliable evidence, . . . or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

---

[5] The NFLPA may argue that any conflict of interest on the part of the NFLPA is irrelevant because it is the Plans' Retirement Board that makes benefit determinations, not the NFLPA. However, the NFLPA appointed half of the Retirement Board members who made the challenged decision and thus had direct influence on those Retirement Board decisions. Moreover, Mr. Upshaw himself – then the union's executive director – conceded the NFLPA's influence over Retirement Board decisions when he proclaimed after *Webster* that "if the six-member board was presented with a similar situation with another retired player, it would follow the same course of action it took with Webster." *See* p. 8, *supra*. Respondents must be permitted to explore the nature and extent of the NFLPA's self-proclaimed influence over Retirement Board decisions.

2003561.1

*Id.* at 968 (citations omitted).

Similarly, in *Liston v. UNUM Corp. Officer Severance Plan*, 330 F.3d 19 (1st Cir. 2003), the First Circuit expressly rejected "an ironclad rule against new evidence" where a district court reviews a plan administrator's decision for arbitrariness. *Id.* at 23. Rather, "discovery may be needed because the decisional process is too informal to provide a record. . . [and] certain kinds of claims - *e.g.*, proof of corruption - may in their nature or timing take a reviewing court to materials outside the administrative record." *Id.*

Other circuits have reached a similar conclusion, allowing beneficiaries to go outside the administrative record to produce evidence of conflict of interest or bias. *E.g.*, *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 174 (2d Cir. 2001) (district court would not be limited to administrative record in evaluating plaintiff's claim that plan administrator's denial of benefits was affected by conflict of interest); *Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 776 n. 4 (8th Cir.1998) ("conducting limited discovery for the purpose of determining the appropriate standard of review does not run afoul of the general prohibition on admitting evidence outside the administrative record for the purpose of determining benefits"). *See also Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 395 (3d Cir. 2000) (remanding case to district court so that it can hear evidence regarding an alleged conflict of interest in plan administration).

Because extrinsic evidence of conflict of interest or bias is relevant in an ERISA

2003561.1

action, it follows that plaintiffs are permitted some limited discovery on those issues. For instance, in *Johnson v. Connecticut General Life Ins. Co.*, 541 F.Supp.2d 935 (N.D. Ohio 2008), the court, explaining that "[c]onsideration of evidence outside the administrative record is appropriate . . . in certain limited circumstances, including that which is offered in support of a procedural challenge to an administrator's decision <u>or alleged bias</u>," permitted the plaintiff to depose the plan administrator's underwriter to develop evidence of the cursory nature of the insurer's review of plaintiff's application for benefits. *Id.* at 939 (emphasis added). In *Asuncion v. Metropolitan Life Ins. Co.*, 493 F.Supp.2d 716 (S.D.N.Y. 2007), the court permitted plaintiff to take discovery of the contracts between the plan administrator and independent consultants involved in denying benefit claims because such evidence was relevant to plaintiff's conflict of interest allegation. *Id.* at 722.

The funding of a benefit plan may also be the subject of discovery and extrinsic proof. In *Kosiba v. Merck & Co.*, 384 F.3d 58 (3d Cir. 2004), the court reversed a former employee's challenge to a denial of benefits under a disability plan because the district court had employed an incorrect standard of review. One issue affecting the standard of review was an alleged conflict of interest in how the plan was funded. The Third Circuit noted that, on remand, the district court could address this issue by permitting extrinsic evidence of the alleged conflict:

> The District Court may, of course, allow the parties on remand to <u>supplement the record to introduce evidence of the Plan's actual funding mechanism</u>. While we have held

> that, in general, the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation, . . . <u>when a court is deciding what standard of review to employ</u> – arbitrary-and-capricious review, or some higher standard . . . – <u>it may consider evidence of potential biases and conflicts of interest that is not found in the administrator's record. The Plan's funding mechanism might well be evidence of this sort</u>.

*Id.* at 67 n. 5 (citations omitted) (emphasis added). *See Trussel v. Cigna Life Ins. Co. of New York*, 552 F.Supp.2d 387, 389-90 (S.D.N.Y. 2008) (court may review evidence outside the administrative record to evaluate claims such as conflict of interest).

The District of Maryland has previously allowed – and the Fourth Circuit has implicitly authorized – discovery outside the administrative record on these same issues. In *Johannssen*, plaintiff's counsel (who is also counsel for Plaintiffs in this action) took the depositions of the plan sponsor (analogous to the NFLMC), the plan administrator, and people who drafted various plan amendments as discovery about conflict of interest and bias by the plan. There was also live testimony at trial on these subjects. *See Johannssen v. District No. 1--Pacific Coast Dist.*, 136 F.Supp.2d 480, 489, 502-03, 506 (D. Md. 2001) (references to deposition and trial testimony). On appeal, the Fourth Circuit reviewed this evidence to support its holding that in light of this "palpable conflict of interest" established by this extrinsic evidence, the proper standard of review was *de novo*. 292 F.3d at 171.[6] This practice of examining

---

[6] Another example of the District Court of Maryland allowing discovery outside the administrative record was in *Webster*, where the court allowed discovery concerning

23

matters outside the administrative record to determine the appropriate standard of review has been followed in other cases in the Fourth Circuit. *E.g.*, *Guthrie*, 509 F.3d at 650 (examination of the structure of the benefits plan and the underlying relationships among the employer, the plan trustee, and the third-party administrator); *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d. 170, 179-80 (4th Cir. 2005) (examination of structure and funding of benefits plan and whether administrators were "closely aligned" with plan sponsor).[7]

In sum, evidence outside the administrative record of a benefits determination is routinely allowed in the Fourth Circuit and elsewhere to determine both the reasonableness of, and the appropriate standard of judicial review applicable to, that determination. Where a plaintiff alleges that the challenged determination was corrupted by a conflict of interest or bias, limited discovery on those issues should be

---

other benefit decisions by the Plans involving brain injury (evidence outside the administrative record), as the Fourth Circuit noted in its opinion. 209 Fed.Appx. at 317 n.5.

[7] In *Glenn*, the Supreme Court implicitly authorized discovery outside the administrative record to explore allegations of conflict of interest and bias when it stated that "[t]he record says little about [the plan administrator's] efforts to assure accurate claims assessment." 128 S.Ct. at 2351 (emphasis added). Indeed, Justice Kennedy, while concurring in the Court's holding concerning the "framework" for determining the applicable standard of review, dissented on the ground that the case should have been remanded to the lower court for factual development of these issues, stating "[u]ntil today's opinion, . . a party in [the plan administrator's] position had no notice of the relevance of these evidentiary considerations." *Id*. at 2356 (Kennedy, J., concurring in part and dissenting in part) (emphasis added). Even the dissent was based on the argument that "[t]here is no evidence of [improper conflict] here." *Id*. at 2357 (Scalia, J., dissenting) (emphasis added).

2003561.1

permitted. Otherwise, as the Third Circuit observed, "direct evidence of purposeful bias is rare in these cases so that, without more searching review, benefits decisions will be virtually immunized." *Pinto*, 214 F.3d at 379.

The NFLPA's Memorandum totally ignores the role that conflict of interest, bias, and animus play in establishing the appropriate standard of review in an ERISA benefits action, as alleged in the Complaint, ¶¶ 3, 18-25, 54, 59, 64. Nor does the NFLPA address – or even acknowledge – the well-established body of case law permitting discovery on this issues. Instead, the NFLPA simply repeats the mantra that discovery should be limited to the administrative record. However, this repetition is no substitute for analysis of the critical importance that conflict of interest, bias, and animus have in the Underlying Action.[8] Likewise, the NFLPA flatly asserts that the standard of review in the Underlying Action is "abuse of discretion," (NFLPA Mem. 6), but left unanswered is how the District of Maryland could possibly make that determination until, as that same court did in *Johannssen*, it examines evidence about the NFLPA's alleged conflicts of interest and bias. That evidence may be obtained only through discovery from the NFLPA.

---

[8] The NFLPA does cite *Bidwell v. Garvey*, 943 F.2d 498 (4th Cir. 1991) for the proposition that ERISA permits a fiduciary to have ties to a plan contributor or sponsor. NFLPA Mem. 16, 18. However, *Bidwell* and similar cases only hold that a relationship between an ERISA fiduciary and a party in interest is not a *per se* conflict of interest. Here, however, Respondents have made a *prima facie* case of an actual economic conflict of interest given the "capped" pool of money that funds both active player salaries and retired player benefits. Respondents should be permitted to take discovery on that actual economic conflict through the deposition of the NFLPA.

25

Most strange is the NFLPA's assertions that "[Respondents] do not claim that any member of the Retirement Board is biased," (NFLPA Mem. 4) and "there is no specific claim that any member of the Plan's Retirement Board, which made the decisions that are challenged," acted inappropriately or was biased." NFLPA Mem. 10. Yet the unmistakable gravamen of Respondents' Complaint in the Underlying Action is that the NFLPA's unrelenting bias and animus toward retired players like Respondents has infected the Retirement Board's benefit determinations.[9] Perhaps only by denying that the charge exists can the NFLPA hope to avoid discovery to explore it.

The NFLPA's position is especially untenable given the extensive public record discussed *supra* at pp. 6-9 documenting its past bias and animus against retired NFL players like Respondents. This extensive <u>public</u> record strongly suggests the existence of an internal, <u>non-public</u> record of this bias and animus, evidence which would be unquestionably relevant to establishing the appropriate standard of review and evaluating the challenged benefit determinations in the Underlying Action. Indeed, the Complaint alleges precisely these facts. *See* Complaint ¶¶ 3, 18-25, 54, 59, 64.

In addition, Respondents have made a *prima facie* case of an economic conflict of interest on the part of the NFLPA because benefits paid by the Plans may decrease

---

[9]   *E.g.*, Complaint ¶ 24 ("As a direct result of [Mr. Upshaw's] bias and animus against retired players, the *Webster* case is just one example of Defendants' deliberate refusal to obey the terms of the Plan and to decide disability benefit claims in a reasonable manner supported by substantial evidence"); ¶ 54 ("Because of the animus and bias demonstrated by Gene Upshaw, who selects half the members of the Retirement Board and the DICC, the Plans' decisions are entitled to no deference and are subject to *de novo* review by this Court").

2003561.1

money available to pay active player salaries under the "salary cap" provisions of the CBA. The NFLPA does not address this actual and palpable conflict of interest, the very type of economic conflict which the Supreme Court has said warrants a less deferential standard of review. *See Glenn*, 128 S.Ct. at 2348-49 (discussing cases of conflict of interest, including *Firestone*, where benefits paid by one party decrease the money available for that party's other uses).[10]

The NFLPA's argument that Respondents should first seek evidence of the NFLPA's conflicts of interest, bias and animus from other sources (NFLPA's Mem. 11-13) is nonsensical, because it is unlikely that the NFLPA has shared such inculpatory documents with persons outside the organization. Rather, it is probable that the NFLPA is the <u>only</u> source for documents and testimony regarding its own conflict of interest, its own bias, and its own animus toward retired players like Respondents. This case is thus unlike *Wyoming v. U.S. Dep't of Agriculture*, 208 F.R.D. 449 (D.D.C. 2002), where the information sought from a non-party was already readily available from a

---

[10] The NFLPA may argue that the Supreme Court's holding in *Glenn* is limited to conflicts of interest created when one party both funds and administers the benefit plan, which does not apply here because the Plans are funded by the NFLMC and administered by a split Retirement Board. However, the Court in *Glenn* did not limit its holding to such structural conflicts but said the rule of diminished deference applied to any situation where an administrator "is operating under a conflict of interest," and then concluded that "[t]hat answer is clear where it is the employer that both funds the plan and evaluates the claims." *Id.* at 2348. Indeed, the financial conflict of interest at issue here – one "capped" pool of money available for both active player salaries and retired player benefits – is precisely the kind of conflict addressed by the Court in both *Firestone* and *Glenn*. Here, Respondents have made a *prima facie* case of such an economic conflict of interest and should be entitled to explore the issue further through a deposition of the NFLPA.

2003561.1

party defendant. Only the NFLPA knows whether, and to what extent, it is biased against the benefit claims of retired NFL players. Only the NFLPA knows whether, and to what extent, the "capped" pool of money available for both active player salaries and retired player benefits creates a conflict of interest in how the NFLPA serves both constituencies. And only the NFLPA knows whether its appointments to the Plans' Retirement Board were made to tilt the scales against retired players. Thus, only by taking discovery from the NFLPA can Respondents fully explore these issues which are critical to establishing the correct standard of review in the Underlying Action.

Finally, Defendants accuse Respondents of "pillory[ing]" the deceased Executive Director of the NFLPA (Gene Upshaw) and ignoring the substantial benefits which he brought to current and former players. NFLPA Mem. 3. But the allegations concerning Mr. Upshaw in the Complaint (which was filed before his death) are plainly relevant because all the benefit determinations being challenged in the Underlying Action were made while Mr. Upshaw ran the NFLPA and appointed half the Retirement Board. These allegations go directly to his influence over the Retirement Board and how his conflict of interest, bias, and animus infected and influenced Retirement Board decisions. Indeed, it was Mr. Upshaw who stated after the *Webster* case that "if the six-member board was presented with a similar situation with another retired player, it would follow the same course of action it took with Webster." Complaint ¶ 22. By declaring what the Retirement Board would do in future cases, Mr. Upshaw <u>himself</u> declared his influence over that body's decision-making process. Plaintiffs simply want

28

to take some discovery to explore the extent and nature of Mr. Upshaw's self-proclaimed influence.

In sum, this Court should deny the NFLPA's Motion to Quash and grant Respondents' Motion to Compel because Respondents are entitled to take discovery on issues of conflict of interest, bias, and animus which the Supreme Court and the Fourth Circuit have repeatedly held to be relevant to establishing the standard of review, as well as evaluating the reasonableness of the challenged benefits determination. This discovery is especially justified in light of prior cases, Congressional hearings, published remarks, and Plan-funding documents which expose the pervasive nature of such conflict and hostility.

**B. <u>The NFLPA Has Failed to Make Any Showing That Any Documents or Testimony Sought by the Subpoena are Protected by the Attorney-Client or other Applicable Privilege</u>.**

The NFLPA asserts as both a "general objection" and as an objection to specific document requests that the documents and testimony sought by the subpoena are privileged. *See* NFLPA Mem. at p. 11 n.3 (general objection no. 5) and at p. 19 (document request no. 7). However, the NFLPA has yet to identify <u>what documents</u> are privileged, <u>which privilege</u> (*i.e.*, attorney-client, work-product doctrine, or common-interest privilege) applies to which documents, or <u>what facts</u> support the claim. Instead, the NFLPA merely makes a blanket claim of privilege for every document covered by the subpoena.

The Federal Rules require a person asserting a claim of privilege under Rule 45

2003561.1

to "describe the nature of the" withheld documents and to do so "in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed.R.Civ.P. 45(d)(2)(A)(ii). *See* Fed.R.Civ.P. 26(b)(5)(A)(ii) (same). The NFLPA has not done so but merely stated that it "will prepare and serve a privilege log as soon as practicable," NFLPA Mem. 25. As of the filing of this Respondents' Memorandum, however, no such log has been served. In *Tuite v. Henry*, 98 F.3d 1411 (D.C. Cir. 1996), the court said that the objecting party must provide this information within a "reasonable time" of a asserting that objection. *Id.* at 1417. In that case, the privilege log was served three weeks after a motion to compel was filed, and the court found that to be a "reasonable time." *Id.* Here, the NFLPA's original motion for protective order was filed in the Underlying Action on September 12, 2008, more than a month ago. Because the NFLPA has failed to produces the required privilege log with sufficient facts to enable Respondents or this Court to evaluate the NFLPA's assertions, its blanket claim of privilege must and should be denied.

## C. **The NFLPA Has Failed to Demonstrate How Production of the Requested Documents Would Create an Undue Burden**.

The NFLPA's claim of "undue burden" to comply with the subpoena is equally barren. It does not offer a single supporting fact that would allow this Court to evaluate its claim of undue burden, such as an estimate of the volume of responsive documents, the number of hours it would take personnel to collect responsive documents, or the cost of production. Nor does the NFLPA claim that responsive documents are in

2003561.1

storage, have been archived, or are inaccessible for any other reason.    All the NFLPA does is make a naked claim of undue burden without any facts to back it up.

This falls far short of the requirement that a person claiming "undue burden" establish by affidavit or other sworn testimony the particulars of the claimed burden. *See Hopson*, 232 F.R.D. at 245.  In *Hopson*, a defendant objected to the production of electronic evidence and submitted an affidavit attesting to the limited number of people available to comply with the request and the competing demands on their time.    The court held that, even with that affidavit, the defendant had failed to meet its burden:

> [The affidavit] was less complete than it should have been. It did identify the limited number of information technology personnel available to conduct the search for electronic records, and the competing demands on their services within the police department, but it failed to estimate the number of hours that would be required for them to conduct the requested review, or to sufficiently demonstrate how this would impact adversely the fiscal and operational capabilities of the police department. <u>A party that seeks an order from the court that will allow it to lessen the burden of responding to allegedly burdensome electronic records discovery bears the burden of particularly demonstrating that burden and of providing suggested alternatives that reasonably accommodate the requesting party's legitimate discovery needs</u>.

*Id.* (emphasis added).  Here, the NFLPA had not submitted <u>any</u> affidavit, let alone one which addresses the factual issues listed in *Hopson* that would allow a court to evaluate its claim of "undue burden."

The NFLPA's only attempt to address these questions is its claim that "[t]he electronically stored information sought by these requests is not reasonably accessible

and cannot be produced without undue burden or cost," NFLPA Mem. at p. 11 n.3 (general objection no. 4). However, this assertion raises more questions than it answers, such as the format(s) of the electronic data, whether the data are backed up, and the cost of accessing it. Depending on those answers, the data may, in fact, be extremely accessible. For example, if the NFLPA uses a common email application like Microsoft Outlook, that data can easily be searched and responsive emails quickly produced via a .pst or similar file. However, NFLPA offers no such information, preferring instead to rely on a bald and unsupported assertion of "undue burden."

The NFLPA's claim of "undue burden" rings particularly hollow in light of the fact that it is one of the best-staffed and wealthiest unions in the United States. According to its Annual Report filed with the U.S. Department of Labor for the period ending Feb. 29, 2008, the NFLPA has 100 employees serving its 5,388 members (*i.e.*, one staff member for every 54 members). For that reporting year, the NFLPA had total assets of more than $293,215,000, total net assets of more than $214,413,000, and total receipts for the year of more than $203,000,000. In fact, the NFLPA made <u>more than $137,000,000 in licensing revenue alone</u> for that last reporting period (*i.e.*, licensing fees from video games, marketing partnerships, etc.). *See* Ex. G hereto (excerpts from NFLPA's Form LM-2).[11]

Moreover, according to its Annual Report, the NFLPA devoted approximately

---

[11] The complete Form LM-2 for the NFLPA is available on the Dept. of Labor's Web site at http://kcerds.dol-esa.gov/query/getOrgQry.do (enter File No. 065-533).

2003561.1

$1,808,990 of this income towards employment of an in-house legal department of ten people, including six staff counsel (R. Berthelsen, T. Depaso, T. English, T. Flanagan, A. McAfee, and J. Nahra) and four paralegals (J. Bazzel, M. Greene, T. Tice, and T. White). In addition, the NFLPA during that reporting period paid 16 outside law firms more than $7,459,500 for legal services. Thus, the NFLPA has substantial financial, staffing, and legal resources at its disposal with which to comply with the subpoena.

In sum, the NFLPA has completely failed to make any showing of undue burden, let alone meet its "heavy burden" for quashing a subpoena on such grounds.

**D. A "Meet and Confer" Between Counsel Once The Scope of Discovery is Determined Can Resolve or Narrow the NFLPA's Remaining Objections.**

The NFLPA's remaining Rule 45(c) objections assert that many of Respondents' document requests are "vague," or that there are no "temporal limitations." *See* NFLPA Mem. at p. 11 n.3 (general objection nos. 4 and 7) and at p. 14 (document request no. 1). The NFLPA does not explain how any requests are vague or why it needs temporal parameters to respond to other requests; but in any event, these objections are best addressed during a "meet and confer" process. *See* Fed.R.Civ.P. 37(a)(1). So far, the NFLPA's counsel has refused to participate in such a process, arguing that any discovery of the NFLPA is precluded. *See* pp. 11-12, *supra*. Therefore, once the threshold question of the right of Respondents to take the requested discovery is determined (by the Maryland court hearing the Underlying Action or by this Court), counsel for the NFLPA and Respondents should meet and confer in a good faith

2003561.1

attempt to resolve or narrow any remaining discovery disputes.

## **CONCLUSION**

This Court should deny the NFLPA's Motion to Quash and grant Respondents' Motion to Compel Production of Documents. Alternatively, this Court should defer a ruling on the NFLPA's Motion to Quash and Respondents' Motion to Compel until after (1) the court in the Underlying Action has ruled on the motion for protective order filed by the Plans; and (2) counsel for Respondents and the NFLPA subsequently meet and confer to attempt to resolve their discovery dispute in light of that ruling.


Dated: October 22, 2008                    _____/s/_____
                                           Cyril V. Smith
                                           D.C. Bar No. 413941
                                           William K. Meyer
                                           Motion for Admission *Pro Hac Vice* Pending
                                           Zuckerman Spaeder LLP
                                           100 East Pratt Street, Suite 2440
                                           Baltimore, MD 21202
                                           (410) 332-0444

                                           Attorneys for Respondents

2003561.1